NOT DESIGNATED FOR PUBLICATION

No. 121,051

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of
BABY GIRL G.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ROBB W. RUMSEY, judge. Opinion filed November 22, 2019. Affirmed in part, reversed in part, and remanded with directions.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita for appellees.

Before POWELL, P.J., PIERRON and ATCHESON, JJ.

PIERRON, J.: P.F. (Father), the biological father of Baby Girl G., appeals the district court's order terminating his parental rights. The district court found that under K.S.A. 2018 Supp. 59-2136(h)(1)(D), Father failed without reasonable cause to support Baby Girl G.'s birthmother, A.G. (Mother), during the last six months of her pregnancy. Father also appeals the district court's award of attorney fees. We affirm in part, reverse in part, and remand with directions.

*Factual and Procedural History*

Mother and Father met in 2017 while working together. They dated briefly in the fall of 2017 but broke up at the end of October. They briefly reconnected in December 2017, and had sex, but they did not resume their romantic relationship.

1

In January 2018, Mother found out she was pregnant. Because she had had sex with two other men around the same time she had sex with Father, she did not think he was the biological father at first. Father heard rumors that Mother was pregnant, but he did not confirm it with her until February 2018.

In a series of text messages from February 14, 2018, Mother was upset with Father for talking about her pregnancy with others. Father replied:

> "I really don't give a fuck about you. . . . [I]f you're pregnant, my only concern would be if it's mine. . . . [I've] never had this kind of contempt for someone before. I've said some of the meanest things I've ever said to [a] person to you."

Mother assured Father the child was not his. Father told her to let him know if she found out otherwise.

In March 2018, after a doctor's appointment, Mother told Father she was now sure he was the child's father. Father indicated he intended to parent the child. He also mentioned both prenatal and postnatal DNA testing to confirm the child was his. The couple discussed prenatal DNA testing several times over the course of the pregnancy but ultimately concluded it was too risky and expensive.

For most of the pregnancy, Mother and Father were in contact through text messages, and over 3,500 text messages were admitted into evidence. In the messages, the two had many amicable discussions. They talked about how excited they both were. They picked a name for the baby together. They discussed Mother's job search. They discussed their respective situations in the present and how they would co-parent in the future. Father often asked Mother how she was doing or if she had eaten.

Their text discussions were not always cordial, though. For example, in March, Father accused Mother of lying about who she had slept with saying "you've had sex with 1,000 people in the last three months." When she denied lying, Father insisted she was responsible for convincing him she was being truthful. He told her, "[Y]ou do understand that I will take that kid from you don't you if you do not cooperate with me???" He eventually apologized, explaining he was scared the child might not be his, and he overreacted. He later told her, "I want you to know that I would never say something like that unless I felt I had to. I don't even remember why I thought I had to at the time now I was so heated, you weren't saying things that I felt were making things better."

A little over a week after that argument, Father asked Mother if it would offend her if he asked about DNA testing at the first doctor's appointment he went to. Mother said it would, adding "[i]t's just starting to bother me that [the child's paternity is] all you ever want to talk about." Father said the issue kept coming up "because I don't know 100%. I want to know 100%."

Father later testified he felt he had been supportive and encouraging in his texts to Mother. He admitted they fought sometimes, but he tried to "de-escalate" the fights. Mother agreed Father was sometimes emotionally supportive. But she also felt Father had been selfish. To her, his overriding concern seemed to be whether he was the biological father. She felt the relationship was one-sided, and he needed more emotional support than she did. When she needed space, he would not respect her wishes and continued to text her constantly.

Even though Mother had a job for most of her pregnancy, she had significant financial difficulties. On two occasions, she told Father she could not pay her rent and was facing eviction. Father offered to let her store things at his home, but he did not provide other financial support. At the end of May 2018, Mother lost her apartment because she could not pay her rent. She then moved in with her current boyfriend. She

3

broke up with her boyfriend briefly in July and had to stay with various relatives before moving back in with him.

Mother also had car problems and went through several cars during her pregnancy. Father gave her a few rides but never offered to help her get her car fixed.

Father had been working at the same full-time job since 2014, making $15.73 an hour. He also had a part-time job at Pizza Hut starting in 2017 but quit in June of 2018. He made minimum wage at that job. In November 2018, he provided a financial affidavit stating his gross monthly income was $3,046. He also lived with his mother and grandmother, who brought in $1,600 and $1,200 respectively.

At the evidentiary hearing, Father testified he did not want to give Mother any cash. He felt she was financially irresponsible because she was being garnished and had been evicted from her apartment. He believed it would have been a waste to give her cash. Instead, he said he wanted to offer her something he felt was more beneficial like shelter, food, storage, or transportation.

Father provided some direct financial support for Mother. Father bought a Vape pen for Mother for about $45 to help her quit smoking. When it broke, he also helped her get it fixed for free. He paid a $35 phone bill for her. He took her out to eat twice, spending somewhere between $30 and $50. And he gave her $5 for gas.

Father made several other offers of financial help that Mother did not accept. He offered to help her pay a $250 security deposit for a new apartment she was considering renting. Once when Mother needed a ride, Father offered to pay for an Uber because he could not leave work to give her a ride himself. Mother said she declined the offer because it would cost too much and she knew she could find another way to get where she needed to go. Another time, Mother told Father she was hungry and would probably

4

not eat that day because she did not have money. Father offered to buy her "some cheap stuff, ramen, etc." Mother eventually responded that her aunt was taking her out to eat. Father also made many general offers to help, such as telling Mother to let him know if she needed anything.

Father also offered to let Mother live with him a couple of times. Mother testified she did not accept his offers because she did not think they were genuine. She also did not see it as a real option because he lived with his mother and grandmother. Father testified his offers were genuine, but he knew Mother was unlikely to move in with him because she was dating someone else.

Father attended four doctor's appointments with Mother, one per month from April through July. Father also attended a six-session parenting class with Mother. As a result of them both attending the class, she could have gotten $400 worth of baby items, but Mother never received them.

Father testified he began acquiring baby items as soon as he found out he was going to be a father. He bought some of the items and others were given to him. He said he did not give Mother any of the items because they had decided to split them. Mother testified many of the items Father claimed to have bought were from her baby shower. According to her, Father only bought one outfit and received some secondhand items.

Father decided to buy a house during Mother's pregnancy. He had to make a hardship withdrawal from his 401(k) to put a $3,000 down payment on the house. He bought the house in June 2018 and closed at the beginning of August 2018. Father said he bought the house to provide stable housing for the child and Mother if she wanted it. But Mother testified Father had dreamed of buying a house for many years, and he was already thinking of buying a house when they dated in the fall of 2017.

In June, Mother began having doubts about whether she could parent the child. She did not think Father would consent to an adoption. But she also did not feel he was supporting her, and she did not feel he was fit to be a parent.

In July, Mother told Father about her appointment for an upcoming sonogram, adding: "There were some mild concerns with [the baby's] growth rate at the last one apparently. They want to make sure she's on track. They said she's measuring more consistent with an October 2nd due date but they didn't change it because it was within 10 days." Father replied, "[S]he's probably not mine then. [T]hat sucks." Mother became upset because Father seemed more concerned with the child's paternity than the child's health. Father later explained, "I mean, my first thought is I want to be the father of this child. There's a second thought, but she also says 'mild concerns.' She didn't go into any further detail than that."

Father posted a Facebook status saying the child might not be his but not mentioning the child's health. Mother asked him to take it down because she did not want all his Facebook friends knowing her business and it made her feel very poorly about herself. Father did not take down the post, but he made it private.

After another argument, Mother stopped responding to Father's texts on July 26, 2018. Father sent several more texts in July and August, one text in September, and a final text in October 2018. He did not find a way to get financial assistance to Mother after she stopped talking to him. Mother had texted him the name of the restaurant where she worked in April 2018, but Father could not remember it. He contacted a family friend of Mother to get information about her, but the friend did not provide any. Father later testified he did not know anyone else who still knew her, but he talked to a mutual friend Mother used to know. On the other hand, Mother claimed they had mutual friends who knew how to get in contact with her.

6

Mother was due on September 26, 2018, but she was voluntarily induced a week early and gave birth to Baby Girl G. on September 19, 2018. She did not tell Father the baby had been born. She also consented to an adoption without telling him, knowing he would not consent.

On September 21, 2018, petitions for adoption of Baby Girl G. and termination of Father's parental rights were filed. Several weeks later, Father submitted a pro se voluntary acknowledgement of paternity to the district court. He also submitted to DNA testing which showed a 99.99% probability he was the biological father. After receiving the DNA test results, Father moved for immediate custody or visitation. On the same day, he answered the adoption petition, asking the district court to dismiss the adoption case and grant him custody. He later filed an answer contesting the petition to terminate his parental rights.

The district court ordered a mental health evaluation for Father. He was diagnosed with dependent personality disorder, major depressive disorder, and generalized anxiety disorder. According to the clinical psychologist who evaluated him, personality disorders cannot be treated with medication. Instead, treatment requires long periods of therapy, sometimes as long as two years. Father had a history of seeking out mental health care but not following through on recommendations for therapy. While Father later admitted he had been dealing with depression for a long time, he disagreed with the personality disorder diagnosis and felt he did not need therapy.

Father also submitted to a substance abuse evaluation and a hair follicle test. The substance abuse evaluation did not recommend treatment for Father. The hair follicle test came back positive for cocaine, methamphetamine, and marijuana. Father later testified he started using illegal drugs when he was 16 and had used them for the past 25 years. In 2018, he used cocaine, methamphetamine, and marijuana. He said he planned to no

7

longer use illegal drugs. He testified the hair follicle test result was consistent with his admitted drug use in 2018. He also submitted to three urinalyses (UAs) which all came back clean.

Father had several supervised visits with Baby Girl G. over the course of the proceedings. During a couple of the visits, Father appeared to have fallen asleep. The visit supervisor later testified she found it unusual that Father would fall asleep during the limited amount of time he had for the visit.

The district court held an evidentiary hearing in March 2019. After the hearing, the court terminated Father's parental rights. It found by clear and convincing evidence that Father had failed to support Mother for the last six months of the pregnancy without reasonable cause. It held that Father's financial support was "insignificant and incidental." It also held that Father "was not emotionally supportive but instead verbally abusive, self-centered, mean, and sarcastic, and not responsive to [Mother's] needs." Father appeals.

*Termination of Parental Rights*

The adoptive parents (Petitioners) petitioned to terminate Father's parental rights for three reasons:  (1) Father was unfit to be a parent under K.S.A. 2018 Supp. 59-2316(h)(1)(B); (2) having knowledge of the pregnancy, Father had failed to provide Mother with support during the last six months of the pregnancy under K.S.A. 2018 Supp. 59-2316(h)(1)(D); and (3) Father had abandoned Mother even though he knew about the pregnancy under K.S.A. 2018 Supp. 59-2316(h)(1)(E).

After the evidentiary hearing, the district court found Petitioners had failed to prove Father abandoned Mother during the pregnancy. The court declined to make a finding on Father's fitness. But the court found Father had failed to support Mother

8

during the last six months of her pregnancy. On appeal, Father challenges this last finding.

When a district court terminates a person's parental rights based on factual findings made under K.S.A. 2018 Supp. 59-2136(h)(1), those factual findings will be reviewed on appeal to determine if, after reviewing all the evidence in the light most favorable to the prevailing party, the district court's findings were highly probable, i.e., supported by clear and convincing evidence. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1468 (2010); see K.S.A. 2018 Supp. 59-2136(h)(1) (findings must be based on "clear and convincing evidence"). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. 290 Kan. at 244.

If an adoption statute is being used to terminate a natural parent's rights without consent, that statute is strictly interpreted in favor of maintaining the natural parent's rights. The party seeking to terminate a parent's rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 2018 Supp. 59-2136. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010).

K.S.A. 2018 Supp. 59-2136(h)(1)(D) states a court may terminate a father's parental rights and find his consent to an adoption unnecessary if the court finds, based on clear and convincing evidence, that "the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." Support is defined as "monetary or non-monetary assistance that is reflected in specific and significant acts and sustained over the applicable period." K.S.A. 2018 Supp. 59-2136(h)(4). In determining whether a father's parental rights should be terminated, the court "[s]hall consider all of the relevant

9

surrounding circumstances" and "may disregard incidental visitations, contacts, communications or contributions." K.S.A. 2018 Supp. 59-2136(h)(2).

An "unwed father must act affirmatively during the mother's pregnancy to protect his rights to the child." *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 664, 666, 29 P.3d 466 (2001). The father need not provide total support for the mother during the last six months of pregnancy, but the father's support must be consequential and reasonable given the circumstances. General offers of support are not enough to satisfy the father's duty of support. And a court may consider a mother's refusal of assistance when determining whether the father provided support. But if the mother fails to make a specific request in response to a father's general offer of support, the mother has not refused his support. *In re Adoption of M.D.K.*, 30 Kan. App. 2d 1176, 1179-80, 58 P.3d 745 (2002).

Being unsure of the child's paternity does not absolve a father of his responsibility to support the mother during pregnancy. Instead, men are presumed to know they may become a father as a result of having sexual intercourse with a woman, regardless of how many other sexual partners she has. "If any of those partners wishes to preserve his parental rights in the event of a later adoption, each one will be required to initiate reasonable efforts toward supporting the mother prior to the child's birth." *In re Adoption of D.M.M.*, 24 Kan. App. 2d 783, 790, 955 P.2d 618 (1997).

In its ruling, the district court acknowledged Father had bought Mother a vape pen, given her $5 for gas, paid a phone bill, treated her to several meals, and gave her a few rides. But the court found this support was incidental, particularly given Mother's financial circumstances. The evidence supports the court's finding, as Father's total financial support amounted to about $115 to $135. Even considering Father's offer to help pay a $250 security deposit, Father's total financial support was still under $400.

10

Father notes he offered to let Mother live with him twice. But Mother testified she did not think the offers were genuine, and this was not a realistic option. Looking at the evidence in a light most favorable to Petitioners, then, this does not constitute substantial support.

Father also claims the evidence shows some of his acts conferred an indirect financial benefit on Mother. Some of the acts he highlights are: (1) allowing Mother to receive mail at his house; (2) offering to allow Mother to store her belongings at his house; (3) offering to help her move; (4) helping her choose health insurance; and (5) providing transportation for Mother's appointment to enroll in the Women, Infants, and Children (WIC) food program.

The evidence does not support Father's claim that these acts conferred any real financial benefit on Mother. While filling out an application for health insurance, Mother asked Father's opinion about which plan she should choose because he worked in the insurance industry. Mother otherwise did all the work to enroll herself, including making an appointment to expedite her enrollment. Mother's insurance covered all her medical expenses.

Later, Mother was trying to enroll in a rewards program through her insurance, but the website she was using kept saying her address was not real. She asked for Father's address so she could have one piece of mail sent there. Mother also enrolled herself in WIC to help cover food expenses. Father provided her a ride home from her appointment to enroll, but he did not give her a ride there.

As for Father's offer to allow Mother to store her belongings at his home, she never took him up on this offer. But if she had, it is not clear whether this would qualify as consequential support. The record does not show how many belongings she had to store or the monetary value of the storage. See *In re Adoption of Baby R.*, No. 108,358,

11

2013 WL 646508, at *6 (Kan. App. 2013) (unpublished opinion) (finding evidence insufficient to show Father's storage of Mother's items constituted financial support).

Based on this evidence, it is questionable whether any of these acts provided any real support for Mother. She did essentially all the work to enroll herself in health insurance and WIC. Father's contributions were negligible in this regard. And the record does not show whether Father's offer to store Mother's belongings constituted a significant financial contribution.

Father also argues the district court failed to consider the "extensive and consistent emotional support" he provided through text messages. The district court held that the two had amicable text messages among the 3,500 texts entered into the record, but the court also held that Father's texts were sometimes "abusive, sarcastic, mean, and self-centered." On appeal, Father does not directly contest the court's finding that his texts could be abusive, sarcastic, mean, and self-centered. Instead, he argues the court ignored the texts in which he was emotionally supportive, and it "took isolated instances out of context to support its finding that any help Father provided was incidental."

Granted, Father sent texts expressing concern for Mother and the child. For example, Father points out an instance when he texted Mother, "With this heat if you need to go somewhere and it's too hot I will come get you and take you because we need you to not be too hot." Another time, Father asked Mother if she would be safe if a tornado hit near where she was. While these texts show concern, it is questionable whether they amount to significant nonmonetary assistance, as required by statute. On top of that, Father also sent many text messages that Mother found upsetting and hurtful. Mother's testimony, as well as her texts to Father, showed she found his texting to be very stressful overall.

Father also points out the steps he took to prepare for fatherhood. For example, he notes he was paying down his debt, and he acquired baby items for his home. But Father did these things for his own benefit, not Mother's, and they conferred no benefit on her. For this reason, these acts do not constitute support for Mother during the last six months of her pregnancy. See *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d at 670 ("[Mother] received no benefit from the used baby clothing and furniture [Father] solicited because they were not delivered to her. This cannot be considered support, since [Mother] did not reap the benefits.").

Alternatively, Father argues he had reasonable cause for failing to support Mother. He contends he had limited financial resources. He also asserts Mother interfered with his ability to provide support.

While K.S.A. 2018 Supp. 59-2136(h)(1)(D) requires a father to provide support for the mother during the last six months of the pregnancy, the statute provides an exception for fathers who fail to provide support because of a reasonable cause. In determining if a father had reasonable cause for failing to provide support, courts must consider all relevant circumstances. *In re Adoption of Baby Girl S.*, 29 Kan. App. at 667. In making this determination, courts "must determine whether the natural father has pursued the opportunities and options which were available to carry out his duties to the best of his ability." *In re Adoption of Baby Boy W.*, 20 Kan. App. 2d 295, 299, 891 P.2d 457 (1994).

As for Father's financial resources, his bank statements from January 2018 through September 2018 were admitted into evidence as well as a summary of his income and expenses from those months prepared by Petitioners' counsel. The statements showed Father frequently went out to eat. He spent hundreds of dollars on credit card payments and withdrew hundreds of dollars in cash. He also had some money left over at the end of each month, though perhaps not much. The district court had also ordered Father to pay

13

$400 per month toward his counsel's fees, and he had made these payments from December 2018 through February 2019.

At the evidentiary hearing, Father testified he essentially lived paycheck to paycheck. He said his credit card payments were for debt he had acquired before meeting Mother. He used the cash withdrawals to pay for utilities since he split those bills with his mother and grandmother. He also helped his mother and grandmother with medical bills. During the course of the pregnancy, he tried to cut costs by not eating out as much. He felt the only extravagance was a $142 online purchase "for something musical." He also guessed he had spent about $100 on drugs between January and September.

The district court rejected Father's argument that he had reasonable cause not to provide support because he had limited financial resources. The court held Father "had disposable and discretionary funds he could have used to support [Mother]." The court noted Father always had at least some money left in his bank account at the end of the month. The court also found Father always had money for his needs and wants, including buying illegal drugs, going out to eat, and paying credit card debt. The court added that Father had quit his second job and bought a house, both of which reduced his resources.

The evidence supports the district court's findings. Based on Father's financial records, he could have provided more financial support to Mother, even if it was not a particularly large amount. By quitting his second job and buying a house, he voluntarily reduced the potential financial resources he had available to help Mother. Given the evidence, it is highly probable Father did not carry out his duty to provide financial support to the best of his ability.

As for Mother's interference, Father claims Mother refused much of the support he offered. Granted, Mother did decline to take Father up on some of his offers. On at least one or two occasions, Mother also told Father that she did not want or need anything

14

from him. But Mother did accept other offers of support, such as his offer to pay her phone bill or give her gas money. The record shows Mother had significant financial difficulties over the course of her pregnancy, particularly regarding housing and transportation. Father never offered to help her cover rent to keep from being evicted or to help her pay for car repairs. The offers he made that Mother rejected were often for incidental support, such as an Uber ride or some ramen.

Father also argues Mother interfered with his ability to provide her support because she cut off contact with him at the end of July. This argument is not persuasive. While Father did not have contact with Mother during the last two months of her pregnancy, he had not provided substantial support in the previous four months. The record shows he did little to get support to her during those two months. According to his own testimony, he only asked two people for information about her.

Likewise, the district court rejected Father's argument on this point. While Mother cut off contact with Father, the court found this was irrelevant. The court noted Father had already made clear he was not going to give her any money. The court added that Father had done little to find Mother, even though evidence suggested he may have been able to do so.

In his brief, Father seems to implicitly make the argument that his rights should not be terminated because he acted in a way that showed he intended to assert his parental rights. The evidence does show Father planned to parent Baby Girl G. and did things to prepare for fatherhood. But under Kansas law, an unwed father has a specific duty to affirmatively provide support, particularly financial support, to the mother during the last six months of the pregnancy to ensure his parental rights. Father's financial support between March and September was inconsequential, amounting to less than $200. While Father relies heavily on his text messages to bolster his argument, his texts were at best insignificant support, and at worst, actively harmful to Mother. The record does not show

15

Father had reasonable cause justifying his failure to support Mother. The result may seem harsh, as Father intended to parent Baby Girl G. and provided some support. But based on the evidence, Father failed to perform his legal duty of support, and the district court did not err in finding so.

Next, Father argues the district court erred in finding it was in Baby Girl G.'s best interest to terminate his rights and grant the adoption. Father cites K.S.A. 2017 Supp. 59-2136(h)(2)(A)-(B), which states the district court may "[c]onsider and weigh the best interest of the child" and "disregard incidental visitations, contacts, communications or contributions" when determining whether to terminate a parent's rights. The Kansas Supreme Court has held this determination is discretionary and may not be the sole basis for terminating a parent's rights under this statute. *In re Adoption of Baby Girl P.*, 291 Kan. at 435.

To begin with, the Kansas Legislature amended this statute, effective July 2018. The statute no longer states the district court may consider the best interest of the child. Instead, it now states the court "[s]hall consider all of the relevant surrounding circumstances" and "may disregard incidental visitations, contacts, communications or contributions." K.S.A. 2018 Supp. 59-2136(h)(2)(A)-(B). Father does not address what effect the statute's new language has on this argument.

Another problem in addressing this argument is the district court provided few findings on this point. In its ruling, the court found only that "[i]t is not in the child's best interests to deny the adoption." The court does not identify any legal standard it may have used or what evidence it may have relied on to reach this conclusion. The lack of findings on this point thus appears to preclude any meaningful review.

Petitioners still try to argue clear and convincing evidence supports the district court's finding. They identify several factors a court must consider in determining

16

whether an adoption is in the best interest of a child. See *In re J.A.*, 30 Kan. App. 2d 416, 425-26, 42 P.3d 215 (2002). They then support many of these factors with information that does not appear to be in the record. For instance, they claim "the adoptive parents' motivation to adopt Baby Girl [G.] is simply to raise her as their permanent, and legal, daughter. They want to offer her love, stability, and opportunity, just as any parent would." But they do not cite to the record where evidence of this was presented.

The only findings the district court made that seem directly relevant to this issue were related to Father's mental health. The record shows Father had sought mental health treatment at COMCARE several times in the past few years. At his most recent COMCARE intake, he was diagnosed with persistent depressive disorder, also known as dysthymia. His mood generally did not respond to medication. Therapy was recommended several times, but he did not follow through on this recommendation.

After his visits to COMCARE, a clinical psychologist evaluated Father for the court-ordered mental health evaluation and diagnosed him with dependent personality disorder. That psychologist testified people with dependent personality disorder have difficulty understanding how their behavior affects others "because they tend to be looking at the world through their needs, their wants, and it's tough for them to fully understand how their behavior is affecting other people." She expressed concern about Father's ability to develop a healthy parent-child relationship because of his focus on his own emotional needs. She also "[had] concerns that part of [Father's] interest in becoming a parent also has to do with his own emotional needs, wanting someone to love him."

The district court found Father had been suffering from a long-term mental illness that would require extensive therapy, but Father had failed to pursue this treatment option. It is questionable whether this alone would be enough to support a finding that it was in Baby Girl G.'s best interest to terminate Father's parental rights. Even so, this

17

finding is discretionary, and the court did not use it as the sole basis for terminating Father's parental rights. Thus, even if it was not supported by substantial competent evidence, this would not necessarily require reversal.

Petitioners also argue that we may affirm on the alternative ground that Father is unfit, even though the district court declined to rule on this issue. In order to do as they ask, instead of simply reviewing the district court's finding, we would have to find Father was unfit by clear and convincing evidence. See K.S.A. 2018 Supp. 59-2136(h) (stating court may order termination of parental rights on a finding of clear and convincing evidence of listed factors). But it is not our role to make fact-findings. Thus, we decline to rule on this issue. See *In re Adoption of D.D.H.*, 39 Kan. App. 2d 831, 837, 184 P.3d 967 (2008) (declining to find Father unfit on appeal when district court had refused to do so).

*Did the District Court Err in Awarding Attorney Fees?*

Father argues the district court erred in awarding attorney fees because it entered its final order without allowing his counsel to submit an updated statement of fees. K.S.A. 2018 Supp. 59-2134(c) provides an adoption proceeding's costs "shall be paid by the petitioner or as assessed by the court." A district court's decision to award attorney fees is reviewed for an abuse of discretion. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 81, 350 P.3d 1071 (2015). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. 302 Kan. at 81.

In November 2018, Father requested a court-appointed attorney. The district court granted Father's request but ordered Father to pay $400 per month toward his attorney

fees. The court also ordered the adoptive parents to advance $1,000 toward Father's attorney fees.

In January 2019, Father's attorney moved for payment of fees accrued to date. She alleged she had spent over 83 hours on his case and accrued an outstanding balance of $12,320 in fees. The district court granted the motion in part and ordered the adoptive parents to pay an additional $2,000 toward Father's attorney fees.

At the end of the termination trial, Father's attorney again raised the issue of attorney fees. Because the district court had not seen her updated total, she offered to submit it so the court could address it at a later date.

A little over two weeks later, the district court entered an order finding Father responsible for the rest of his attorney's unpaid fees. The court stated Father had originally retained his attorney, paying her $2,500, but later requested a court-appointed attorney. The court found Father partially indigent and ordered him to pay $400 a month to his attorney. Father's attorney also asked the court to appoint her. The court did so but advised her it would determine the appropriate amount of fees at the end of the case.

In its final order on attorney fees, the district court found Father's counsel had already been paid $6,700, and she "[had] indicated that she has 78.6 hours work invested into this case and is requesting total fees of $12,780." The court also noted the adoptive parent's counsel had presented information that Father had a "Go Fund Me" page to raise money to fight the adoption, and he had raised $600 toward his goal of $10,000 "even though [Father] has been provided appellate counsel through the courts." The court then concluded Father was not indigent and ordered him to pay his counsel's remaining fees.

Father argues the district court erred because it entered an order without allowing his counsel to provide an updated fee total. The record suggests the court did have counsel's updated fee totals. The court appears, however, to have misread them.

As part of her January 2019 motion for fees, Father's counsel presented a record of her charges from October 22, 2018, until January 12, 2019. The record showed counsel had billed 83.1 hours at $200 an hour for a total of $16,620. Counsel then subtracted $4,300 worth of payments she had already received, resulting in a total fee of $12,320.

Father's attorney also filed a motion objecting to the district court's final award of attorney fees, attaching two updated statements. Petitioners also added an email from Father's attorney to the record on appeal. That email included the updated statements. Petitioners claim this email was also received by the district court before it entered its order, but this is not clear from the record. One statement covers fees accrued from January 1 to January 31, 2019, when counsel was apparently still with a law firm. At the top of that statement it states "PREVIOUS BALANCE: $10,420." This appears to be the total amount of fees counsel had accrued from October 22, 2018, until December 31, 2018, minus all payments made in that time. The statement then lists fees accrued in January 2019. The statement showed counsel billed 23.8 hours at $200 an hour, resulting in an additional $4,760 in fees. Counsel added this to her previous balance, for a total of $14,780. Finally, she subtracted $2,000 worth of payments, ending in a total of $12,780.

Father's counsel also provided a second statement covering the period from February 16, 2019, until March 9, 2019, including the three days of trial. It appears counsel had left her previous law firm at this point. The statement shows 54.8 billable hours at $150 an hour. Counsel subtracted a $400 payment, resulting in a total of $7,820. Looking at these two statements together, Father's counsel billed a total of 78.6 hours after December 31, 2018. She also requested a total fee of $20,600.

20

In its order, the district court's findings suggest it had access to these two updated statements. For example, the court notes Father's counsel had billed 78.6 hours. This is consistent with the total billed hours from the two updated statements, and not the 83.1 total billed hours claimed in counsel's first statement. The court also acknowledged counsel charged $200 an hour while with the law firm but only charged $150 an hour after she left the law firm. This information was included in the two updated statements and not counsel's first statement.

Even so, the district court appears to have misread the updated statements. The court found "[Counsel] has indicated she had 78.6 hours work invested into this case and is requesting total fees of $12,780." But counsel's statements show she had worked 78.6 hours in 2019 alone. This does not include time worked in 2018. Additionally, $12,780 represents the total fees accrued up to January 31, 2019, while counsel was still at the law firm. It does not include the $7,820 she accrued once she left the law firm.

Additionally, in evaluating the reasonableness of attorney fees, a court should consider the eight factors listed in Kansas Rule of Professional Conduct 1.5(a) (2019 Kan. S. Ct. R. 300). *Snider v. American Family Mut. Ins. Co.,* 297 Kan. 157, 169, 293 P.3d 1120 (2013). Those eight factors are:

> "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> "(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> "(3) the fee customarily charged in the locality for similar legal services;
> "(4) the amount involved and the results obtained;
> "(5) the time limitations imposed by the client or by the circumstances;
> "(6) the nature and length of the professional relationship with the client;
> "(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

21

"(8) whether the fee is fixed or contingent." Rule 1.5(a)(2019 Kan. Ct. R. 300).

The district court did not reference Rule 1.5 in its order nor do its comments suggest it considered any of these factors.

Father claims the district court did not have his attorney's updated fee statements when it entered its final order assessing all remaining fees to Father. Based on the court's order, it appears to have had the statements because it made fact findings based on information in those statements. Nonetheless, the court appears to have misread the statements, making its findings inaccurate. Additionally, the court failed to consider the factors listed in Rule 1.5. As a result, the district court erred in assessing attorney fees, and the fee award is reversed and remanded.

On remand the district court should determine: (1) what is a reasonable fee under these circumstances; (2) how much should Father be assessed considering his income and other reasonable circumstances; (3) how much should the adoptive parents be assessed; (4) should the rates used by the Board of Indigents Defense Services be used; and (5) the application of Rule 1.5(e) and *Snider*.

Affirmed in part, reversed in part, and remanded with directions.

\* \* \*

ATCHESON, J., concurring: Although I concur in the result affirming the Sedgwick County District Court's termination of Father's parental rights in conjunction with the adoption of Baby Girl G. and remanding for further consideration of the attorney fee issue, I offer an observation on how the child's best interest has been considered in this case.

22

The adoptive parents of Baby Girl G. filed their action to terminate Father's parental rights in September 2018, and the district court entered the termination order in March 2019. The parties debated in the district court and again on appeal whether Baby Girl G.'s "best interest" would be furthered by terminating Father's rights and allowing the adoption. The district court found the adoption would be in the child's best interest. Under K.S.A. 2017 Supp. 59-2136(h)(2)(A), a district court could consider the best interest of the child in terminating a parent's rights but was not obligated to do so. K.S.A. 2017 Supp. 59-2136(h)(2)(A) ("In making a finding whether parental rights shall be terminated under this subsection, the court may: [A] Consider and weigh the best interest of the child."). In 2018, the Kansas Legislature replaced the permissive consideration of the child's best interest with a mandatory assessment of the "relevant . . . circumstances" bearing on termination. K.S.A. 2018 Supp. 59-2136(h)(2)(A) ("In making a finding whether parental rights shall be terminated under this subsection, the court: [A] Shall consider all of the relevant surrounding circumstances.").

On appeal, the parties have not invited us to look at the legislative amendment—they haven't even mentioned it. And the district court did not presume to apply the new statutory provision. Under the circumstances, I see no reason why we should go where we haven't been invited. The best interest consideration in K.S.A. 2017 Supp. 59-2136(h)(2)(A) replicates one of the criteria for terminating parental rights under the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq. See K.S.A. 2018 Supp. 38-2269(g)(1). We have consistently held that the best interests determination in the revised code is entrusted to the district court's sound discretion, and we will review the determination only for an abuse of that discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). The same standard presumably governs here.

A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on

23

unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011). I see no abuse of discretion here in assessing Baby Girl G.'s best interest.

The district court pointed out Father's mental health history that entailed chronic depression and a personality disorder, both of which were, according to the hearing testimony, resistant to quick treatment or resolution. Based on that testimony, the district court found that Father's mental health "adversely affect[ed] his everyday activities." So those problems could seep into his relationship with Baby Girl G. and any ongoing interaction with the child's mother if the adoption did not go forward. Not to put too fine a point on it, Father and Mother had an emotionally toxic relationship. Mentioned only briefly in the district court's findings, Father had longstanding substance abuse issues. At the time of the hearing, he appeared to have those problems in check. Balanced against those negatives, Father had supervised visits with Baby Girl G. leading up to the termination hearing that were, for the most part, positive, although he appeared to have fallen asleep during a couple of the sessions. He also had purchased a house shortly before Baby Girl G.'s birth, so he had a suitable residence. The district court made sufficient findings for us to assess its conclusion.

Given our deferential review on this issue, I would not tamper with the district court's best interest determination.